UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
DEEDEE HALLECK and JESUS PAPOLETO MELENDEZ,       :
                                                  :
                            Plaintiffs,           :
                                                  :
            -against-                             :
                                                  :   **COMPLAINT**
THE CITY OF NEW YORK; MANHATTAN COMMUNITY         :
ACCESS CORPORATION; DANIEL COUGHLIN; IRIS         :   Jury Trial Demanded
MORALES; JEANETTE SANTIAGO; and CORY BRYCE,       :
                                                  :   ECF Case
                            Defendants.           :
                                                  :
------------------------------------------------------------------------x

Plaintiffs DEEDEE HALLECK and JESUS PAPOLETO MELENDEZ, by their attorney, Robert T. Perry, respectfully allege as follows:

### NATURE OF ACTION

1. Plaintiffs brings this action for preliminary and permanent injunctive relief, compensatory damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violation of their civil rights under 42 U.S.C. § 1983 and the First Amendment to the United States Constitution. Plaintiffs also assert supplemental claims under New York law.

2. The City of New York ("the City") has created an electronic public forum -- the cable public access channels in Manhattan -- delegating control of that forum to the Manhattan Community Access Corporation, commonly known as Manhattan Neighborhood Network ("MNN"), an entity largely funded by the City through cable television franchise fees and whose board of directors includes City employees. Exercising its delegated authority, MNN has barred plaintiff Melendez from all MNN services and facilities and censored plaintiff Halleck's programming, all because MNN officials disagree with plaintiffs' viewpoints, in violation of

plaintiffs' free speech rights under the First Amendment and Article 1, Section 8 of the New York State Constitution. MNN has further prevented members of the general public, including plaintiffs, from attending and videotaping regular meetings of MNN's board of directors, in violation of the New York Open Meetings Law.

## JURISDICTION AND VENUE

3. This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First Amendment to the United States Constitution.

4. The Court has jurisdiction over plaintiffs' federal law claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

5. The Court has jurisdiction over plaintiffs' supplemental state law claims under 28 U.S.C. § 1367.

6. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to plaintiffs' claims occurred in this district.

## JURY DEMAND

7. Plaintiffs demand trial by jury of all issues properly triable thereby pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

8. Plaintiff DEEDEE HALLECK is a resident of the City, County, and State of New York.

9. Plaintiff JESUS PAPOLETO MELENDEZ is a resident of the City, County, and State of New York.

10. Defendant THE CITY OF NEW YORK ("the City") is, and was at all times relevant herein, a municipal corporation duly organized and existing under the laws of the State of New York.

11. Defendant MANHATTAN COMMUNITY ACCESS CORPORATION, commonly known as Manhattan Neighborhood Network ("MNN"), is a not-for-profit corporation organized under the laws of the State of New York.

12. Defendant DANIEL COUGHLIN is and was MNN's Executive Director at all relevant times herein. Defendant Coughlin is being sued in his individual capacity.

13. Defendant IRIS MORALES was Director of the MNN El Barrio Firehouse Community Media Center at all relevant times herein. Defendant Morales is being sued in her individual capacity.

14. Defendant JEANNETTE SANTIAGO is and was MNN's Programming Director at all relevant times herein. Defendant Santiago is being sued in her individual capacity,

15. Defendant CORY BRYCE is and was MNN's Manager of Production & Facilitation at all relevant times herein. Defendant Bryce is being sued in his individual capacity.

## STATEMENT OF FACTS

### Cable Public Access Channels

16. Cable operators use cable or optical fibers strung above ground or buried in ducts to reach the homes and businesses of their subscribers.

17. Because the construction of this physical infrastructure entails the use of public rights-of-way and often results in significant disruption of streets, alleys, and other public property, cable operators must obtain franchises from local governments.

3

18. Almost all cable franchise agreements require cable operators -- as a condition for easements to use the public rights-of-way -- to dedicate some channels for programming by the public ("cable public access channels") -- channels which "are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet." H.R. Rep. No. 934, 98th Cong., 2d Sess. 30 (1984), *reprinted in*, 1984 U.S.C.C.A.N. 4655, 4667.

19. Cable public access channels serve as a conduit for "groups and individuals who generally have not had access to the electronic media . . . to become sources of information in the electronic marketplace of ideas." H.R. Rep. No. 934, 98th Cong., 2d Sess. 30 (1984), *reprinted in*, 1984 U.S.C.C.A.N. 4655, 4667.

20. Cable public access channels typically are available for the free use of the public on a first-come, first-served, nondiscriminatory basis.

21. Almost from the inception of cable public access channels, cable operators have been barred from exercising editorial discretion over such channels.

22. In most communities, there is a single cable operator that provides service in a given geographical area.

23. To ensure that cable operators, even absent competition from other cable operators in the same geographical area, provide "the widest possible diversity of information sources and services to the public," 47 U.S.C. § 521(4), Congress enacted the Cable Communications Policy Act of 1984, Public Law No. 98-549, 98 Stat. 2780 (1984) ("the 1984 Cable Act"), which included provisions relating to cable public access channels.

24. The 1984 Cable Act ratified the pre-existing authority of local governments to require that cable operators, as a condition of cable franchise approval, provide cable public access channels. *See* 47 U.S.C. 531(a).

25. The 1984 Cable Act also prohibits cable operators generally from exercising any editorial control over any constitutionally protected expression appearing on cable public access channels. 47 U.S.C. § 531(c).

26. In regulating cable franchising by local governments in the State of New York, the New York State Public Service Commission ("PSC") has adopted certain minimum standards for cable public access channels, which the PSC defines as "channel[s] designated for noncommercial use by the public on a first-come, first-served, nondiscriminatory basis." 16 N.Y.C.R.R. 895.4(a).

27. The PSC's regulations provide that a municipality may designate an entity other than the cable operator to operate and administer the cable public access channels in that community. 16 N.Y.C.R.R. 895.4(c)(1).

28. The PSC's regulations also provide that the designated entity shall schedule channel time on the cable public access channels "on a first-come, first-served, nondiscriminatory basis." 16 N.Y.C.R.R. 895.4(c)(4).

29. The PSC's regulations further provide that neither the cable operator nor the municipality generally may exercise editorial control over cable public access channels. 16 N.Y.C.R.R. 895.4(c)(8)-(9).

30. The City has awarded cable franchises in Northern and Southern Manhattan to Time Warner Entertainment Company, L.P. ("Time Warner").

31. Section 8.1.1 of the respective franchise agreements requires Time Warner to set aside certain cable channels for public access.

32. Section 8.1.8 of the respective franchise agreements provides that the cable public access channels in Manhattan shall fall under the jurisdiction of an "independent, not-for-profit,

membership corporation" -- a Community Access Organization or CAO -- designated by the Manhattan Borough President.

33. Section 3.3.01 of the Grant and Use Agreement by and between Time Warner and the CAO annexed to the respective franchise agreements provides that" "The CAO shall maintain reasonable rules and regulations to provide for open access to Public Access Channel time, facilities, equipment, supplies, and training on a non-discriminatory basis and to the extent required by applicable law."

34. The Manhattan Borough President has designated the Manhattan Community Access Corporation -- commonly known as Manhattan Neighborhood Network ("MNN") -- to oversee the cable public access channels in Manhattan.

35. Incorporated in 1991, MNN is funded by the City from franchise fees collected not only from Time Warner but also from Verizon and RCN Corporation, which now are also franchised by the City to provide cable television service in Manhattan.

36. MNN's Board of Directors ("the MNN Board") is comprised of 13 members, two of whom are selected by the Manhattan Borough President and work full-time in the latter's office.

37. While MNN's principal offices and studio are at 553 West 59th Street in Manhattan, MNN opened the MNN El Barrio Firehouse Community Media Center ("the El Barrio Firehouse") in East Harlem in early 2012.

**Plaintiffs' Suspension from MNN's Facilities and Services**

38. Plaintiff Halleck has been involved in cable public access programming in Manhattan since the 1970's, as not only a producer but also an advocate of such programming.

39. Plaintiff Melendez has been involved in cable public access programming in Manhattan since the mid-1990's, principally through assisting youth in East Harlem in producing such programming.

40. On the evening of December 14, 2011, plaintiff Halleck, Kym Clark, Carlos Pareja, and Betty Yu came to the El Barrio Firehouse to speak at the regular quarterly meeting of the MNN Board, which was being held that evening at the Firehouse.

41. Plaintiff Halleck, Ms. Clark, Mr. Pareja, and Ms. Yu sought to urge the MNN Board to reinstate a community media grant program and a youth program which had recently been discontinued.

42. Upon learning that plaintiff Halleck, Ms. Clark, Mr. Pareja, and Ms. Yu were present, defendant Coughlin approached them and said that the MNN Board meeting was closed.

43. When plaintiff Halleck observed that MNN's by-laws required all regular MNN Board meetings to be open to the public, defendant Coughlin told her that the by-laws had been changed, which was not true.

44. In early January 2012, plaintiff Melendez accepted an invitation from defendant Morales, MNN's new Director of the El Barrio Firehouse, to join MNN's Community Leadership Program.

45. The Community Leadership Program was ostensibly designed to provide individuals of artistic merit and community commitment with training in field and studio production.

46. Those invited to participate in the Community Leadership Program, including plaintiff Melendez, were to meet for training sessions on Wednesday evening for consecutive 10 weeks.

7

47.     On February 28, 2012, plaintiff Halleck e-mailed Norris Chumley, a member of the MNN Board, requesting that she, plaintiff Melendez, and Kym Clark be allowed to attend and speak at the regular quarterly meeting of the MNN Board in March 2012.

48.     On March 10, 2012, defendant Coughlin replied to plaintiff Halleck by e-mail, inviting plaintiffs Halleck and Melendez and Ms. Clark to attend the regular quarterly meeting of the MNN Board at the El Barrio Firehouse on Wednesday evening, March 14, 2012.

49.     On Wednesday evening, March 14, 2012, at about 7:00 p.m., the MNN Board held a regular quarterly meeting at the El Barrio Firehouse.

50.     Pursuant to the invitation extended by defendant Coughlin (*see* ¶ 48 *supra*), plaintiffs Halleck and Melendez and Ms. Clark attended the regular quarterly meeting of the MNN Board on Wednesday evening, March 14, 2012.

51.     Plaintiff Halleck brought a video camera to videotape the meeting.

52.     The Community Leadership Program also held its weekly training session that evening, Wednesday, March 14, 2012, at the El Barrio Firehouse.

53.     Plaintiff Melendez initially went to the training session but stepped out to attend the meeting of the MNN Board downstairs.

54.     As soon as plaintiff Halleck began videotaping, the MNN Board abruptly ended the meeting and adjourned.

55.     Plaintiff Melendez then returned to the training session upstairs.

56.     Shortly thereafter, defendant Morales came into the training session and told plaintiff Melendez that she wanted to speak with him.

57.     Plaintiff Melendez followed defendant Morales out of the El Barrio Firehouse.

58. On the sidewalk outside the El Barrio Firehouse, defendant Morales screamed at plaintiff Melendez, calling him "a traitor."

59. By the time that defendant Morales finished her tirade, the training session was over.

60. Plaintiff Melendez went back inside the El Barrio Firehouse, picked up his belongings, and left.

61. The following Wednesday evening, March 21, 2012, plaintiff arrived at the El Barrio Firehouse to attend the Community Leadership Program's weekly training session only to learn that he was barred from participation.

62. The next day, Thursday, March 22, 2012, plaintiff Melendez called defendant Morales for a clarification of his status in the Community Leadership Program and was told to come to the El Barrio Firehouse to meet with defendant Morales the following day.

63. On Friday afternoon, March 23, 2012, plaintiff Melendez met with defendant Morales in a studio at the El Barrio Firehouse.

64. Defendant Morales screamed at plaintiff Melendez, threw crumpled papers at him, and at one point struck him, though not with great force.

65. Using strong language but without raising his voice, plaintiff Melendez told defendant Morales that she was acting inappropriately.

66. Hearing defendant Morales's screams, an MNN security guard entered the office.

67. Plaintiff Melendez got up and left the El Barrio Firehouse.

68. By letter dated April 12, 2012, defendant Coughlin informed plaintiff Melendez that defendant Morales had withdrawn her invitation to him to participate in the Community

9

Leadership Program "due to conduct incompatible with the program's team-building and open communications values."

69. Defendant Coughlin stated -- falsely -- that "your confrontational, disrespectful and loud behavior on March 23 necessitated an intervention from MNN staff alarmed about Ms. Morales's safety."

70. Nearly four months later, on July 19, 2012, MNN held an invitation-only formal opening of the El Barrio Firehouse.

71. MNN invited, among others, a select group of public officials, including then Manhattan Borough President Scott Stringer and then City Council Member Melissa Mark-Viverito, to the opening.

72. Even though they were not invited to the opening, plaintiffs stood outside the entrance to the El Barrio Firehouse during the opening, interviewing invitees on videotape as they arrived.

73. When Jose Angel Figueroa, defendant Morales's boyfriend and a participant in MNN's Community Leadership Program, arrived for the opening, plaintiff Halleck asked him -- politely -- "Would you like to say something about public access?"

74. Mr. Figueroa angrily replied to plaintiff Halleck, "Don't fuck with me."

75. Plaintiff Melendez responded in kind, "Hey fuck you."

76. Mr. Figueroa then rushed towards plaintiff Melendez to assault him.

77. An MNN security guard intervened, grabbing Mr. Figueroa before he could strike plaintiff Melendez.

78. Despite his attempted assault and battery on plaintiff Melendez, Mr. Figueroa was allowed to enter the El Barrio Firehouse to attend the opening.

79.   A short while later, plaintiff Melendez stated to plaintiff Halleck as she videotaped him in front of the El Barrio Firehouse:

> You know what's funny. I had to wait for my people to stop working in this building so that I can gain access to it. Do you understand what I'm saying? Our people, our people, people of color, are in control of this building and I have to wait until they are fired, or they retire, or someone kills them so that I can come and have access to the facility here. Because I am being locked out by people of color. There's irony for you.

80.   In later August or early September 2012, plaintiff Halleck submitted two programs to MNN's programming department for airing as "specials" on MNN's cable public access channels, including a program entitled "The 1% Visits the Barrio" based on the video footage taken by plaintiff Halleck in front of the El Barrio Firehouse on July 19, 2012.

81.   "The 1% Visits the Barrio" aired on one of MNN's cable public access channels at 8:30 a.m. on October 2, 2012.

82.   By letter dated October 11, 2012, defendant Santiago, MNN's Programming Director, informed plaintiff Halleck that she was suspended for three months from airing programs over MNN's cable public access channels for violating MNN's program policies.

83.   Defendant Santiago stated that "The 1% Visits the Barrio" program airing on October 2, 2012 violated MNN program content restrictions barring "participation in harassment or aggravated threat toward staff and/or other producers."

84.   Defendant Santiago asserted, in particular, that plaintiff Melendez's statement in "The 1% Visits the Barrio" program -- that "People of color work in this building and I have to wait until people get fired, they retire or someone kills them so that I can come and have access to the facility here." -- incited violence and harassment towards staff and was in direct violation of MNN's "zero tolerance on harassment."

85. Although defendant Santiago's letter to plaintiff Halleck was dated October 11, 2012, plaintiff Halleck did not receive the letter until October 24, 2012.

86. By letter to defendant Coughlin dated October 25, 2012, plaintiff Halleck appealed the decision to suspend her for three months from airing programs over MNN's cable public access channels.

87. Plaintiff Halleck protested that defendant Santiago, in her October 11, 2012 letter, had selectively quoted plaintiff Melendez's statement in "The 1% Visits the Barrio" program and taken the statement out of context.

88. Plaintiff Halleck asserted that plaintiff Melendez's statement in "The 1% Visits the Barrio" program merely expressed his despair at being barred from use of a neighborhood facility and denied that the statement incited violence or threatened anyone.

89. Plaintiff Halleck suggested that the real reason for the suspension was because she had questioned the transparency and accountability of MNN's management.

90. By letter to plaintiff Halleck dated November 19, 2012, defendant Coughlin denied plaintiff Halleck's appeal of her three-month suspension from airing programs over MNN's public access channels.

91. Disregarding plaintiff Melendez's full statement in "The 1% Visits the Barrio" program (*see* ¶ 79 *supra*), defendant Coughlin asserted that "[t]he fact remains that the words 'kills them' were used in a direct reference to MNN staff of color that currently manage and/or work at the MNN El Barrio Firehouse."

92. In closing, defendant Coughlin warned plaintiff Halleck that "[f]uture failure to follow MNN policies may result in permanent suspension from accessing MNN facilities and services."

93. On July 6, 2013, plaintiffs Halleck and Melendez met defendant Coughlin by chance at a mutual friend's private party in the Catskills, to which all three had been invited.

94. Plaintiff Melendez politely sought to address his status at MNN with defendant Coughlin.

95. Defendant Coughlin angrily replied that it was not the appropriate time to discuss the matter.

96. Plaintiff Melendez uttered some vulgarities but did not strike or push or threaten defendant Coughlin.

97. The chance encounter lasted about a minute.

98. Realizing that defendant Coughlin's anger precluded a constructive discussion, plaintiff Halleck led plaintiff Melendez away.

99. By letter to plaintiff Melendez dated August 1, 2013, defendant Coughlin suspended plaintiff Melendez from all MNN services and facilities indefinitely.

100. Defendant Coughlin stated -- falsely -- that during the chance encounter on July 6, 2013, plaintiff Melendez said that he wanted to and was going to "fuck me up."

101. Defendant Coughlin also stated -- falsely -- that plaintiff Melendez pushed him over.

102. Defendant Coughlin further stated -- falsely -- that plaintiff Melendez engaged in a disrespectful and loud confrontation with defendant Morales in March 2012, necessitating staff intervention.

103. Defendant Coughlin also stated -- falsely -- that in July 2012 outside the El Barrio Firehouse plaintiff Melendez was involved in a threatening altercation with an invited MNN guest (Jose Angel Figueroa) following an exchange of insults.

104. In closing, defendant Coughlin stated that MNN had "zero-tolerance for harassment or threats of violence of any kind towards MNN staff, producers or users."

105. By letter to plaintiff Halleck dated August 9, 2013, defendant Coughlin suspended plaintiff Halleck for one year effective immediately from all MNN services and facilities.

106. Defendant Coughlin repeated his false assertions about plaintiff Melendez's words and actions during the chance encounter on July 6, 2013. *See* ¶¶ 100-103 *supra*.

107. Defendant Coughlin further asserted that MNN continued to be in receipt of complaints about the public posting of plaintiff Halleck's "The 1% Visits the Barrio" program on YouTube.

108. In closing, defendant Coughlin stated that MNN had "zero-tolerance for harassment or threats of violence of any kind towards MNN staff, producers or users."

109. Although plaintiff Halleck's one-year suspension from MNN's services and facilities ended on August 9, 2014, she still cannot air "The 1% Visits the Barrio" program on MNN's cable public access channels or, for that matter, any programming in which plaintiff Melendez appears, since plaintiff Melendez is barred from MNN services and facilities.

110. On April 17, 2015, plaintiff Melendez visited MNN's 59th Street facility to submit a "Project Request Form" for a cable public access program entitled "El Barrio (East Harlem) Community Poet, Jesus Papoleto Melendez Chats with El Barrio's ArtSpace P.S. 109 Residency-Artists."

111. Plaintiff Halleck accompanied plaintiff Melendez, videotaping plaintiff Melendez submitting the "Project Request Form" to MNN employees.

112. Defendant Bryce, MNN's Manager of Production & Facilitation, informed plaintiff Melendez during the visit that he was still suspended from all MNN services and facilities indefinitely.

113. MNN security officers escorted plaintiff Melendez from the building.

114. By letter to plaintiff Melendez dated April 24, 2015, defendant Bryce returned plaintiff Melendez's "Project Request Form."

115. Defendant Bryce stated that plaintiff Melendez's indefinite suspension from all MNN services and facilities remained in full force and effect and that plaintiff Melendez was not permitted to access any MNN facility, equipment, or service.

116. Defendant Bryce also stated -- falsely -- that plaintiff Melendez's indefinite suspension was due to plaintiff Melendez's pattern of harassment, threats and violent conduct toward MNN staff and facility users in 2012 and 2013.

117. Defendant Bryce further stated that the videotaping during plaintiff Melendez's April 17, 2015 visit to MNN's 59th Street facility was disrespectful and in direct violation of MNN's Code of Conduct which prohibits "Video, photo or audio recording of any employee, user or guest without their informed consent."

118. Notwithstanding his attempted assault on plaintiff Melendez on July 19, 2012, Jose Angel Figueroa continued to have access to MNN services and facilities after that date.

### FIRST CLAIM FOR RELIEF

**(First Amendment Claim Under 42 U.S.C. § 1983)**

119. Plaintiffs repeat and reallege paragraphs "1" through "118" with the same force and effect as if they were fully set forth herein.

120. Defendants have barred and/or restricted plaintiffs' access to an electronic public forum, because of viewpoints expressed by plaintiffs, in violation of plaintiffs' rights to freedom of speech under the First Amendment to the United States Constitution.

## SECOND CLAIM FOR RELIEF

### (New York State Free Speech Claim)

121. Plaintiffs repeat and reallege paragraphs "1" through "120" with the same force and effect as if they were fully set forth herein.

122. Defendants have barred and/or restricted plaintiffs' access to an electronic public forum, because of viewpoints expressed by plaintiffs, in violation of plaintiffs' rights to freedom of speech under Article 1, Section 8 of the New York State Constitution.

## THIRD CLAIM FOR RELIEF

### (New York Open Meetings Law Claim)

123. Plaintiffs repeat and reallege paragraphs "1" through "122" with the same force and effect as if they were fully set forth herein.

124. Article 7 of the New York Public Officers Law ("the Open Meetings Law") declares, in part, that: "It is essential to the maintenance of a democratic society that the public business be performed in an open and public manner and that the citizens of this state be fully aware of and able to observe the performance of public officials and attend and listen to the deliberations and decisions that go into the making of public policy." N.Y. Public Officers Law Art. 7, § 100.

125. To accomplish that purpose, the Open Meetings Law provides that "[e]very meeting of a public body shall be open to the general public, except that an executive session

may be called and business transaction therein in accordance with section one hundred five of this article." N.Y. Public Officers Law Art. 7, § 103(a).

126. A "meeting" is defined as "the official convening of a public body for the purposes of conducting public business . . . ." N.Y. Public Officers Law Art. 7, § 102(1).

127. A "public body" is defined as "any entity, for which a quorum is required in order to conduct public business and which consists of two or more members, performing a governmental function for the state or for an agency or department thereof, or for a public corporation as defined in section sixty-six of the general construction law . . . ." N.Y. Public Officers Law Art. 7, § 102(1).

128. A "public corporation" is defined to include a municipality. N.Y. Gen. Mun. Law § 66(1)-(2).

129. As a public body within the meaning of the Open Meetings Law, MNN is required to make the regular meetings of its board of directors open to the general public.

130. MNN continues to hold regular meetings of its board of directors without permitting the general public to attend and videotape the meetings, in violation of the Open Meetings Law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand the following relief jointly and severally against all the defendants:

(A) A preliminary and permanent injunction restraining defendants from interfering with plaintiffs' exercise of their free speech rights over the cable public access channels in Manhattan;

(B)     A preliminary and permanent injunction restraining defendants from violating the Open Meetings Law by barring the general public from attending and videotaping regular meetings of MNN's board of directors;

(C)     Compensatory damages in an amount to be determined at trial;

(D)     Punitive damages in an amount to be determined at trial;

(E)     Reasonable attorney's fees and costs of this litigation; and

(F)     Such other relief as this Court deems just and proper.

Dated: Brooklyn, New York
       October 14, 2015

                                              Respectfully submitted,

                                              *Robert T. Perry*
                                              ROBERT T. PERRY (RP-1199)
                                              45 Main Street, Suite 230
                                              Brooklyn, New York 11201
                                              (212) 219-9410
                                              *Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
DEEDEE HALLECK and JESUS PAPOLETO MELENDEZ,

                                          Plaintiffs,

           -against-

THE CITY OF NEW YORK; MANHATTAN COMMUNITY
ACCESS CORPORATION; DANIEL COUGHLIN; IRIS
MORALES; JEANETTE SANTIAGO; and CORY BRYCE,

                                          Defendants.
-------------------------------------------------------------------------x

**COMPLAINT**

ROBERT T. PERRY
45 Main Street, Suite 230
Brooklyn, New York 11201
(212) 219-9410
*Attorney for Plaintiff*