UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------·
                                       :

DEEDEE HALLECK, *et ano.*,        :

                                       :        15cv8141

            Plaintiffs,     :

                                       :        OPINION & ORDER

            -against-      :

                                       :

THE CITY OF NEW YORK, *et al.*,   :

                                       :

            Defendants.     :

------------------------------------------· :

WILLIAM H. PAULEY III, District Judge:

Plaintiffs DeeDee Halleck and Jesus Papoleto Melendez—cable public access producers in Manhattan—assert claims under 42 U.S.C. § 1983 and the First Amendment to the United States Constitution (the "First Amendment Claims"); Article 1, Section 8 of the New York State Constitution (the "State Free Speech Guarantee"); and Article 7 of the New York Public Officers Law (the "Open Meeting Law") against Defendants the City of New York, Manhattan Community Access Corporation (operating as the Manhattan News Network or "MNN"), Daniel Coughlin, Jeannette Santiago, Cory Brice, and Iris Morales. Plaintiffs seek, among other things, injunctive relief restraining Defendants from interfering with Plaintiffs' exercise of their free speech rights.[1]

Defendants move to dismiss the Amended Complaint. Defendants' motion to dismiss is granted with respect to Plaintiffs' First Amendment Claims. This Court declines to

---

[1] Although the Amended Complaint also seeks compensatory and punitive damages, Plaintiffs appear to acknowledge that 47 U.S.C. § 555a(a) precludes the award of monetary damages in actions asserting violations of the Constitution arising from the regulation of cable television. See, e.g. Coplin v. Fairfield Pub. Access Television Comm., 111 F.3d 1395, 1407 (8th Cir. 1997).

exercise jurisdiction over Plaintiffs' remaining state-law claims—the State Free Speech Guarantee and the Open Meeting Law.

## BACKGROUND

The following facts are derived from the Amended Complaint and presumed true for purposes of this motion.

### A.  Public Access Channels

Cable operators must obtain franchises from local governments to lay the cable or optical fibers needed to reach subscribers.  (Am. Compl. ¶¶ 15–16.)  As a condition for granting those franchises and their attendant benefits, most local governments require cable operators to dedicate some channels for programming by the public on a first-come, first-serve basis (i.e., "public access channels").  Such channels were encouraged by the Cable Communications Policy Act of 1984 (the "1984 Cable Act"), which established that "franchising authorit[ies] . . . may require as part of a cable operator's proposal for a franchise renewal . . . that channel capacity be designated for public, educational, or governmental use."  47 U.S.C. § 531(b).  The 1984 Cable Act further established that "cable operator[s] shall not exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to this section" except for programs that are "obscene or are otherwise unprotected by the Constitution of the United States."  47 U.S.C. §§ 531(e), 544(d).  In New York State, regulations promulgated by the Public Service Commission ("PSC") require that every "franchisee of a cable television system with a channel capacity of 36 or more channels shall designate . . . at least one full-time activated channel for public access use."  N.Y. Comp. Codes R. & Regs. tit. 16, § 895.4(b)(1).  Those regulations define public access channels as those "designated for noncommercial use by the public on a first-come, first-served, nondiscriminatory basis."  N.Y. Comp. Codes R. & Regs. tit. 16, § 895.4(a)(1).  They prohibit "editorial control"

except for "measures as may be authorized by Federal or State law to prohibit obscenity or other content unprotected by the First Amendment of the United States Constitution."  16 N.Y.C.R.R §§ 895.4(c)(8)–(9).

The City of New York awarded cable franchises to Time Warner Entertainment Company, L.P. ("Time Warner").  (Am. Compl. ¶ 30.)  Under its franchise agreements, Time Warner must reserve public access channels to be administered by an "independent, not-for-profit, membership corporation" (known as a community access organization or "CAO") designated by the Manhattan Borough President.  (Am. Compl. ¶¶ 31–32.)  Under the franchise agreements, "[t]he CAO shall maintain reasonable rules and regulations to provide for open access to Public Access Channel time, facilities, equipment, supplies, and training on a non-discriminatory basis to the extent required by applicable law."  (Am. Compl. ¶ 33.)

The Manhattan Borough President designated MNN to administer Manhattan's public access channels.  (Am. Compl. ¶ 34.)  MNN's stated mission is to "ensure the ability of Manhattan residents to exercise their First Amendment rights through moving image media to create opportunities for communication, education, artistic expression and other non-commercial uses of video facilities on an open and equitable basis."  (Am. Compl. ¶ 37.)[2]  Coughlin is MNN's Executive Director, Santiago is MNN's Programming Director, and Brice is MNN's Manager of Production and Facilitation.  (Am. Compl. ¶¶ 11–14.)  MNN maintains a facility in East Harlem known as MNN El Barrio.  (Am. Compl. ¶ 38.)  The Manhattan Borough President chooses two of MNN's thirteen-member Board of Directors.  (Am. Compl. ¶ 36.)

B.  Plaintiffs' Suspension from MNN

In December 2011, Halleck and others were denied entry to an MNN board

_____

[2] Manhattan Neighborhood Network Policies, available at
http://www.mnn.org/sites/default/files/mnn_policies_may2015.pdf (last visited December 12, 2016)).

meeting.  (Am. Compl. ¶¶ 41–43.)  On March 14, 2012, Plaintiffs attended the MNN Board of

Directors quarterly meeting pursuant to an invitation from Coughlin.  (Am. Compl. ¶ 51.)  After

Halleck began videotaping the meeting, the MNN board abruptly adjourned.  (Am. Compl. ¶ 55.)

Shortly thereafter, Defendant Morales spoke with Plaintiff Melendez and, for reasons that are

unclear from the Amended Complaint, called him "a traitor."  (Am. Compl. ¶ 59.)

On March 23, 2012, Melendez met with Morales regarding MNN's community

leadership program.  (Am. Compl. ¶ 64.)  Morales screamed at him, threw papers and lightly

struck him.  Hearing the screams, an MNN security guard entered Morales's office and

Melendez left. (Am. Compl. ¶¶ 67–68.)  In April 2012, Coughlin informed Melendez that

Morales had withdrawn the invitation for Melendez to participate in the community leadership

program "due to conduct incompatible with the program's team-building and open

communications values," such as his "confrontational, disrespectful and loud behavior on March

23."  (Am. Compl. ¶¶ 70–71.)  Plaintiffs surmise that the real reason for withdrawing the

invitation was because Melendez had attended the MNN board meeting, which Halleck

videotaped.

In July 2012, MNN held an invitation-only formal ceremony for MNN El Barrio

which was attended by many New York City politicians.  (Am. Compl. ¶¶ 72–73.)  Although

Halleck and Melendez were not invited, they stood outside to video record and interview

attendees, including Morales' boyfriend, Joseph Figueroa.  When Halleck asked him to comment

about public access, Figueroa responded, "Don't f--- with me."  (Am. Compl. ¶ 76.)  When

Melendez responded, "Hey f--- you," Figueroa rushed at him.  (Am. Compl. ¶ 77.)  Later,

Halleck taped Melendez making the following statement:

> You know what's funny?  I got to wait for my people to stop working in this
> building so that I can gain access to it.  Do you understand what I'm saying?  Our

> people, our people, people of color, are in control of this building and I have to wait
> until they are fired, or they retire, or someone kills them so that I can come and
> have access to the facility here.  Because I am being locked out by people of color.
> There's irony for you.

(Am. Compl. ¶ 81.)  In August or September 2012, Halleck submitted her July 2012 footage for

broadcast as a program titled "The 1% Visits the Barrio" to air on MNN.  That program

presented MNN as an organization more interested in pleasing "the 1%" than the East Harlem

community.[3]

In October 2012, Santiago informed Halleck that she was suspended for three

months because her program, "The 1% Visits the Barrio," contained footage in which Melendez

made statements intended to incite violence and harassed staff in violation of MNN program

content restrictions.  (Am. Compl. ¶¶ 85–87.)  Coughlin denied Halleck's appeal of her three-

month suspension.  (Am. Compl. ¶ 94.)

In July 2013, Coughlin rebuffed Plaintiffs' inquiries regarding Melendez's status

at MNN.  (Am. Compl. ¶¶ 98–100.)  Then in August 2013, Coughlin suspended Melendez from

all MNN services and facilities, asserting that Melendez had threatened and pushed him.  (Am.

Compl. ¶¶ 104–07.)  Referencing the July 2013 encounter, Coughlin also suspended Halleck for

one year, and asserted that MNN continued to receive complaints about "The 1% Visits the

Barrio."  (Am. Compl. ¶¶ 111–13.)  While Halleck's suspension has lapsed, she is still not

permitted to air "The 1% Visits the Barrio" or any other program with Melendez.  Plaintiffs

allege that the City is aware of these suspensions.  (Am. Compl. ¶ 126.)

## LEGAL STANDARD

---

[3] The video is available at https://www.youtube.com/watch?v=QEbMTGEQ1xc.  The incident with Figueroa begins around the one minute and forty-second mark, and Melendez's statement about people of color begins around the twenty-one minute and twenty-second mark.

On a motion to dismiss, the factual allegations in a complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor.  Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 663, 678 (2009) (citation omitted); Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010).  However, a claim must rest on "factual allegations sufficient to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  A pleading offering "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" fails to state a claim.  Iqbal, 556 U.S. at 678 (citation omitted).

## DISCUSSION

"[T]he constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state."  Hudgens v. Nat'l Labor Relations Bd., 424 U.S. 507, 513 (1976).  Section 1983 provides that "every person who, under color of any statute, ordinance, regulation, custom, or usage of any state subjects, or causes to be subjected, any . . . person . . . to the deprivation of any [federally protected] rights, privileges, or immunities . . . shall be liable to the party injured . . ."[4]

Defendants move to dismiss, arguing that (1) the City took no action concerning Plaintiffs' suspension, and (2) MNN and its employees are not state actors and therefore not liable for any federal civil rights violation.

---

[4] The State Free Speech Guarantee establishes that "[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."  It "was added [to New York's Constitution] in 1821 as part of the New York Bill of Rights, which was essentially based on the Bill of Rights contained in the United States Constitution."  SHAD All. v. Smith Haven Mall, 66 N.Y.2d 496, 500 (1985).  The State Free Speech Guarantee is generally "interpreted consistently with the Federal Constitution."  Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 915 F. Supp. 2d 574, 623 n.21 (S.D.N.Y. 2013).

A.  First Amendment Claims Against the City

The Supreme Court has "conclu[ded] that Congress . . . intend[ed] municipalities

and other local government units to be included among those persons to whom § 1983 applies."

Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978).   However,

"Congress did not intend municipalities to be held liable unless action pursuant to official

municipal policy of some nature caused a constitutional tort."   Monell, 436 U.S. at 691.

"Plaintiffs who seek to impose liability on local governments under § 1983 must prove that

action pursuant to official municipal policy caused their injury.  Official municipal policy

includes the decisions of a government's lawmakers, the acts of its policymaking officials, and

practices so persistent and widespread as to practically have the force of law."  Connick v.

Thompson, 563 U.S. 51, 60–61 (2011) (internal quotation marks and citations omitted).  The

"first inquiry in any case alleging municipal liability under § 1983 is the question whether there

is a direct causal link between a municipal policy or custom and the alleged constitutional

deprivation."  City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989).

In Jersawitz v. People TV, 71 F. Supp. 2d 1330 (N.D. Ga. 1999), the court

addressed substantially similar allegations by a public access producer against a municipality.

There, the City of Atlanta selected People TV to manage public access channels in accord with

its cable franchise agreement.  When a public access producer sued Atlanta and People TV after

being barred from the facility, the court dismissed claims against Atlanta for the following

reasons:

> There is no evidence that the City itself took any action in violation of Plaintiff's
> constitutional rights under the First Amendment or that it had a policy or custom
> that permitted People TV or any People TV employee to violate Plaintiff's First
> Amendment rights.   Further,  the  evidence  clearly  shows  that  the  City,  in  the

> agreement with People TV, required People TV to comply with all applicable
> federal, state and local laws, rules, regulations, and policies and directed People TV
> to operate public access on a nondiscriminatory and reasonable basis. The City
> cannot be held liable for any violation of Plaintiff's First Amendment rights.

Jersawitz, 71 F. Supp. 2d at 1339.  Jersawitz is consistent with Monell's requirement that a direct

link between municipal policy and the alleged constitutional violation exist.  And here, the sole

allegation against the City is the bald assertion that it was "aware that MNN has censored

plaintiffs' and other cable access programming."  (Am. Compl. ¶ 126).  Thus, as in Jersawitz,

Plaintiffs' claims against the City are not legally cognizable under Monell and must be

dismissed.[5]

   B. First Amendment Claims Against MNN

MNN argues that it cannot be held liable for constitutional violations because it is

a private entity.  "[A]ctions of private entities can sometimes be regarded as governmental action

for constitutional purposes."  Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 378 (1995).

For example, in Lebron, the Supreme Court held that "where . . . the Government creates a

corporation by special law, for the furtherance of governmental objectives, and retains for itself

permanent authority to appoint a majority of the directors of that corporation, the corporation is

part of the Government for purposes of the First Amendment."  Lebron, 513 U.S. at 399

(addressing Amtrak).  Here, the Lebron test is not satisfied because, among other things, the

Manhattan Borough President only has the authority to appoint two of MNN's thirteen board

members.  Cf. Jersawitz, 71 F. Supp. 2d at 1338 (holding that a cable public access operator was

a state actor where it was paid directly by the municipality, had a majority of its board appointed

by the government, and had other obligations to the municipality not present here).

---

[5] Plaintiffs raise the general principle that a government entity "cannot avoid its constitutional responsibilities by delegating a public function to private parties."  Georgia v. McCollum, 505 U.S. 42, 53 (1992).  This is true, but that principle does not negate the pleading standard for municipal liability under Monell.

In addition,

> the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008) (quoting Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 296 (2001)).  Plaintiffs argue that the "public function test" renders MNN a state actor because public access channels are First Amendment "public fora," and the regulation of free speech in a public forum is a traditional and exclusive public function.

Plaintiffs are correct that the regulation of free speech in a public forum is "a traditional and exclusive public function."  Lee v. Katz, 276 F.3d 550, 555 (9th Cir. 2002) (holding that a private entity charged with regulating speech at a public forum was a "state actor" under the "public function" test when it was regulating such speech); see also Watchtower Bible & Tract Soc'y of New York, Inc. v. Sagardia De Jesus, 634 F.3d 3, 10 (1st Cir. 2011) (finding, in the context of a "public function" test analysis, that "regulating access to and controlling behavior on public streets and property is a classic government function.").  Thus, if Plaintiffs have plausibly pled that MNN's administration of public access channels constitutes the administration of public fora, then they have plausibly pled that MNN was a "state actor" under the public function test.

"The classic examples of traditional public fora are streets, sidewalks, and parks, which are properties that have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between

citizens, and discussing public questions." Hotel Employees & Rest. Employees Union, Local

100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation,

311 F.3d 534, 544–45 (2d Cir. 2002) (internal quotation marks omitted). In addition to

traditional public fora, there are "designated" public fora, i.e. "a non-public forum that the

government has opened for all types of expressive activity." Hotel Employees, 311 F.3d at 545–

46. "[R]estrictions on speech in designated public fora are constitutional only if they are

content-neutral time, place, and manner restrictions that are (1) necessary to serve a compelling

state interest and (2) narrowly drawn to achieve that interest." Hotel Employees, 311 F.3d at

545.

       The issue of whether public access channels are designated public fora has

divided courts. In All. for Cmty. Media v. F.C.C., the D.C. Circuit found that cable public

access channels are not public fora:

> [C]able access channels are [not] so dedicated to the public that the First
> Amendment confers a right on the users to be free from any control by the owner
> of the cable system. . . . [T]he fact that a regulated entity is a common carrier—that
> under certain circumstances it must provide communications facilities to those who
> desire access for their own purposes does not render the entity's facilities "public
> forums" in the First Amendment sense and does not transform the entity's
> discretionary carriage decisions into decisions of the government. A heavily
> regulated private carrier of electricity may cut off service without having its
> decision scrutinized as if it were a state decision, and a private cable operator may
> refuse to carry indecent programming without having its decision tested by First
> Amendment principles applicable to the government alone.

All. for Cmty. Media v. F.C.C., 56 F.3d 105, 123 (D.C. Cir. 1995) ("ACM") (internal citations

omitted), aff'd in part, rev'd in part on other grounds, Denver Area Educ. Telecom. Consortium,

Inc. v. F.C.C., 518 U.S. 727 (1996).

       In Denver Area Educ. Telecom. Consortium, Inc. v. F.C.C., 518 U.S. 727 (1996),

the Supreme Court reversed the ACM court in part, finding, among other things, that highly

restrictive regulations requiring cable operators to segregate certain "patently offensive"

programing violated the First Amendment.  Justice Breyer's plurality opinion found it

"unnecessary" and "unwise" for the Court to "definitively to decide whether or how to apply the

public forum doctrine to leased access channels."  Denver Area, 518 U.S. at 749.  In a concurring

opinion, Justice Kennedy opined that public access channels are designated public fora.  With

references to the legislative history of the Cable Communications Policy Act of 1984 (for which

the House Report characterized public access channels as "the video equivalent of the speaker's

soap box or the electronic parallel to the printed leaflet"), as well as the nature of cable

franchising arrangements with local municipalities, Justice Kennedy held that it is "clear that

when a local government contracts to use private property for public expressive activity, it

creates a public forum."  Denver Area, 518 U.S. at 791–92 (Kennedy, J., concurring) (internal

citations omitted).[6]

In dissent, Justice Thomas argued that public access channels are not public fora

because: (1) "cable systems are not public property"; (2) "the nature of the regulatory restrictions

placed on cable operators by local franchising authorities is not consistent with the kinds of

governmental property interests [that] may be formally dedicated as public forums [such as

sidewalks, theaters, streets and parks]"; and (3) "the assertion of government control over private

property cannot justify designation of that property as a public forum."  Denver Area, 518 U.S. at

829–831.  "Thus, the numerous . . . obligations imposed on the cable operator in managing and

operating the public access channels [demonstrate] that these channels share few, if any, of the

---

[6] See also Denver Area, 518 U.S. at 791–92 ("Public fora do not have to be physical gathering places, nor are they limited to property owned by the government.  Indeed, in the majority of jurisdictions, title to some of the most traditional of public fora, streets and sidewalks, remains in private hands.  Public access channels are analogous; they are public fora even though they operate over property to which the cable operator holds title.") (Kennedy, J., concurring).

basic characteristics of a public forum . . . public access requirements . . . are a regulatory

restriction on the exercise of cable operators' editorial discretion, not a transfer of a sufficient

property interest in the channels to support a designation of that property as a public forum."

Denver Area, 518 U.S. at 831 (Thomas, J., dissenting).

       "Whether courts should apply the traditional First Amendment 'forum analysis'

to public access channels at all, or what type of forum courts should deem public access channels

to be, remains a complex question after . . . Denver Area."  Egli v. Strimel, No. 14-cv-6204,

2015 WL 5093048, at *4 (E.D. Pa. Aug. 28, 2015).  Some courts have held that public access

channels are, or at least could be, public fora.  See Egli, 2015 WL 5093048, at *4 (holding that

"at the very least [courts] have 'made clear that the First Amendment does protect the right to

free expression on . . . public access cable channels'" and denying a motion to dismiss on that

ground) (quoting Rhames v. City of Biddeford, 204 F. Supp. 2d 45, 50 (D. Maine 2002));

Jersawitz, 71 F. Supp. 2d at 1341 ("First Amendment law and the evidence support Plaintiff's

contention that People TV's cablecasting facilities are a designated public forum, available to

anyone whose videotape meets the technical and content requirements established by People TV

and the City"); Brennan v. William Paterson Coll., 34 F. Supp. 3d 416, 428 (D.N.J. 2014)

(noting that plaintiff plausibly alleged that cable public access channels were a designated public

forum).[7]

       Other courts have held that public access channels are not public fora.  Notably,

that is the consensus view of courts within the Second Circuit.  For example, one judge in the

Southern District of New York adopted ACM's conclusion and held "that cable access channels

---

[7] See also Britton v. City of Erie, Pa., 933 F. Supp. 1261, 1268 (W.D. Pa. 1995) ("A public-access cable television channel is a public forum.") (citing Missouri Knights of the Ku Klux Klan v. City of Kansas City, Missouri, 723 F. Supp. 1347, 1351 (W.D. Mo. 1989)).

are [not] so dedicated to the public that the First Amendment confers a right on the users to be free from any control by the owner of the cable system." Glendora v. Cablevision Sys. Corp., 893 F. Supp. 264, 270 (S.D.N.Y. 1995). And another Southern District judge endorsed that conclusion in Glendora v. Tele-Commc'ns, Inc., No. 96-cv-4270 (BSJ), 1996 WL 721077, at *3 (S.D.N.Y. Dec. 13, 1996) ("[P]ublic access channels are not First Amendment 'public forums."). Similarly, an Eastern District of New York judge adopted the Glendora decisions, finding that "courts have routinely held that public access channels are not First Amendment 'public forums' for the purposes of state action." Morrone v. CSC Holdings Corp., 363 F. Supp. 2d 552, 558 (E.D.N.Y. 2005).[8]

In short, there is no clear precedent governing whether public access channels are public fora. The issue is certainly a close call. However, this Court agrees with those courts in this Circuit and elsewhere which have concluded that public access channels are not public fora. MNN is a private company that operates television channels, and "[t]he ownership and operation of an entertainment facility are not powers traditionally exclusively reserved to the State, nor are they functions of sovereignty." Glendora v. Cablevision Sys. Corp., 893 F. Supp. 264, 269 (S.D.N.Y. 1995). [9] Moreover, in Loce v. Time Warner Entm't Advance/Newhouse P'ship—the most apt Second Circuit opinion cited by either side—the Court of Appeals held:

---

[8] See also Griffin v. Public Access Cmty. Tel., No. A–10–CA–602–SS, 2010 WL 3815797, at *4 (W.D. Tex. Sept. 27, 2010) ("[A] public access channel is not a public forum."); Hebrew v. Houston Media Source, Inc., No. 09–CV–3274, 2010 WL 2944439, at *6 (S.D. Tex. Jul. 20, 2010) ("[T]his court has found no circuit court or Supreme Court case holding that a public access local cable channel operates as a public forum."); Wilcher v. City of Akron, 05-cv-866, 2005 WL 1140676, at *6-8 (N.D. Ohio May 13, 2005) (holding public access channel was not a public forum where there was no "clear bond between the cable operators and local government.").

[9] See also Wilcher v. City of Akron, 498 F.3d 516, 519 (6th Cir. 2007) ("TV service is not a traditional service of local government. A service provided by a distinct minority of local governments cannot fairly be characterized as a function traditionally reserved to the state."); Griffin v. Pub. Access Cmty. Television, No. A10CA602SS, 2010 WL 3815797, at *3 (W.D. Tex. Sept. 27, 2010) ("There are no allegations in the complaint that providing services for individuals to produce public access television shows, or determining the content of a TV channel, is a traditional service of local government. Accordingly, PACT is not a state actor under this test."); Hebrew v. Houston Media Source, Inc., No. 09-CV-3274, 2010 WL 2944439, at *5 (S.D. Tex. July 20, 2010) ("Plaintiff has presented no facts

13

> the fact that federal law requires a cable operator to maintain leased access channels and the fact that the cable franchise is granted by a local government are insufficient, either singly or in combination, to characterize the cable operator's conduct of its business as state action. Nor does it suffice that cable operators, in their management of leased access channels, are subject to statutory and regulatory limitations.

Loce, 191 F.3d 256, 267 (2d Cir. 1999).   Though Loce addressed leased access—not public access—channels,[10] its holding implicitly rejects Plaintiffs' argument that public access channels are designated public fora because they are "required by government fiat."  (Opp'n Br. at 12.) Indeed, the fact that New York's public access channels are required by state regulation means that aggrieved public access producers may pursue regulatory claims even if they do not have First Amendment claims.  The PSC regularly holds administrative proceedings to address claims brought by public access producers seeking to challenge public access channel operators' compliance with PSC regulations requiring administration of the channels on a nondiscriminatory basis.  See, e.g., Amano v. City of New York, 04-V-0321, 2006 WL 4470759 (N.Y.P.S.C. Aug. 30, 2006).

In short, because Plaintiffs cannot establish that MNN was operating a public forum, they fail to plead that MNN was a state actor under Section 1983.  Accordingly, Plaintiffs' First Amendment claim is dismissed.

C. State-Law Claims

"Where . . . federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."  Klein

---

concerning how Defendant's role as a conduit for the production and distribution of local television programs is a traditional service of local government, i.e., a function traditionally reserved to the State.  Therefore, Defendant's actions are not fairly attributable to the State under the public function test.").

[10]  "Leased access channels, as distinct from public access channels, are those the cable operator must set aside for unaffiliated programmers who pay to transmit shows of their own without the cable operator's creative assistance or editorial approval."  Denver Area, 518 U.S. at 794–95 (Kennedy, J. concurring)

& Co. Futures v. Bd. of Trade of City of New York, 464 F.3d 255, 262 (2d Cir. 2006); Kolari v.

New York–Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006).  Because Plaintiffs' First

Amendment claim has been dismissed, this Court declines jurisdiction over Plaintiffs' state-law

claims.

CONCLUSION

Defendants' motion to dismiss is granted.  The Clerk of Court is directed to

terminate any pending motions and mark this case as closed.

Dated: December 13, 2016
     New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.