16-4155-cv

Halleck v. Manhattan Community Access Corp., et al.

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term 2016

Argued:  June 19, 2017                                    Decided: February 9, 2018

Docket No. 16-4155

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:** _____
**DATE FILED:** Feb. 09, 2018

- - - - - - - - - - - - - - - - - - - - - -

DEEDEE HALLECK, JESUS PAPOLETO MELENDEZ,

Plaintiffs-Appellants,

v.

MANHATTAN COMMUNITY ACCESS CORPORATION, DANIEL
COUGHLIN, JEANETTE SANTIAGO, CORY BRYCE, CITY OF NEW YORK,

Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - -

Before:  NEWMAN, JACOBS, and LOHIER, <u>Circuit Judges</u>.

Appeal from the December 14, 2016, judgment of the District Court for the

Southern District of New York, (William H. Pauley III, District Judge), dismissing

for failure to state a valid claim allegations of First Amendment violations

against the City of New York and a private corporation and its employees

operating a public access television channel. *See Halleck v. City of New York*, 224 F.

1

Supp. 3d 238 (S.D.N.Y. 2016). The Plaintiffs-Appellants contend that a public

access channel is a public forum.

Affirmed as to the City of New York, reversed as to Manhattan

Community Access Corporation and its employees, and remanded.

Judge Lohier concurs with a separate opinion; Judge Jacobs concurs in part

and dissents in part with a separate opinion.

> Robert T. Perry, Brooklyn, NY, for Plaintiffs-Appellants.
>
> Michael B. de Leeuw, (Tamar S. Wise, on the brief), Cozen O'Connor, New York, NY, for Defendants-Appellees Manhattan Community Access Corporation, Daniel Coughlin, Jeanette Santiago and Cory Bryce.
>
> Scott N. Shorr, Asst. Corp. Counsel, New York, NY (Zachary W. Carter, Corp. Counsel of the City of New York, Claude S. Platton, Asst. Corp. Counsel, New York, NY, on the brief), for Defendant-Appellee City of New York.

JON O. NEWMAN, <u>Circuit Judge</u>:

This appeal presents the issue of whether the First Amendment's

limitation on governmental restriction of free speech applies, in the

circumstances of this case, to the operators of public access television channels.

2

More specifically, the main issue is whether the Amendment applies to employees of a non-profit corporation, designated by the Manhattan Borough President to oversee public access TV channels, who are alleged to have suspended individuals involved in public access TV programming from using the corporation's facilities. This issue arises on an appeal by Deedee Halleck and Jesus Papoleto Melendez from the December 14, 2016, judgment of the District Court for the Southern District of New York (William H. Pauley III, District Judge). *See Halleck v. City of New York*, 224 F. Supp. 3d 238 (S.D.N.Y. 2016). The judgment dismissed, for failure to state a valid claim, the Plaintiffs-Appellants' complaint against Manhattan Community Access Corporation ("MCAC"); three of its employees, Daniel Coughlin, Jeanette Santiago, and Cory Bryce; and the City of New York (the "City"). The complaint alleged violations of 42 U.S.C. § 1983; Article 1, Section 8 of the New York State Constitution; and Article 7 of the New York State Public Officers Law.

We conclude that the public access TV channels in Manhattan are public forums and that MCAC's employees were sufficiently alleged to be state actors taking action barred by the First Amendment to prevent dismissal of the claims

against MCAC and its employees, but not against the City. We therefore affirm in part, reverse in part, and remand.

## Background

*Statutory, regulatory, and contractual framework.* The Cable Communications Policy Act of 1984 (the "Act") has special provisions for two categories of cable TV channels—leased channels and public, educational, or governmental channels. "[T]o promote competition in the delivery of diverse sources of video programming," 47 U.S.C. § 532(a), the Act requires cable system operators to "designate channel capacity for commercial use by persons unaffiliated with the operator," *id.* § 532(b)(1). These are generally called "leased channels." *See Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 734 (1996) ("*Denver Area*").

The Act also authorizes cable franchising authorities to require for franchise renewal "that channel capacity be designated for public, educational, or governmental use," 47 U.S.C. § 531(b), and to require "adequate assurance that the cable operator will provide adequate public, educational, and governmental access channel capacity, facilities, or financial support," *id.* § 541(a)(4)(B). These are what Justice Kennedy's opinion in *Denver Area* called

"PEG access channels." 518 U.S. at 781. Public access channels, the P in PEG, are "available at low or no cost to members of the public, often on a first-come, first-served basis." *Id*. at 791.[1]

In New York, a Public Service Commission regulation requires a cable TV system with a capacity for 36 or more channels to "designate . . . at least one full-time activated channel for public access use." N.Y. Comp. Codes R. & Regs. tit. 16, § 895.4(b)(1). The regulation defines a public access channel as a channel "designated for noncommercial use by the public on a first-come, first-served, nondiscriminatory basis." *Id*. § 895.4(a)(1).

The City awarded cable franchises for Manhattan to Time Warner Entertainment Company, L.P. ("Time Warner"). First Amended Complaint ("FAC") ¶ 30. The franchise agreement for Northern Manhattan provides that Time Warner will provide four public access channels. The agreement recites that the Manhattan Borough President has designated a not-for-profit, nonmembership corporation to serve as the Community Access Organization

---

[1] Justice Kennedy further explained, "Under many franchises, educational channels are controlled by local school systems, which use them to provide school information and educational programs. Governmental access channels are committed by the cable franchise to the local municipal government, which uses them to distribute information to constituents on public affairs." *Denver Area*, 518 U.S. at 790.

("CAO") for the borough "under whose jurisdiction the Public Access Channels shall be placed for purposes of Article 8 of this Agreement," which applies to public, educational, and governmental services. That CAO is the Defendant-Appellee MCAC, known as Manhattan Neighborhood Network ("MNN").

*Allegations of First Amendment violations*. Plaintiffs-Appellants Deedee Halleck and Jesus Papoleto Melendez alleged that MNN, three of its employees, and the City violated their First Amendment rights by suspending them from using MNN's public access channels because of disapproval of the content of a TV program that Halleck had submitted to MNN's programming department for airing on MNN's public access channel.  This claim is based on the following factual allegations, which we accept as true for purposes of reviewing, *de novo*, the dismissal of the complaint.

Both Halleck and Melendez have been involved in producing public access programming in Manhattan. In July 2012, MNN held an event to mark the opening of the El Barrio Firehouse Community Media Center ("El Barrio Firehouse"). Halleck and Melendez stood outside, interviewing invitees. In August or September 2012, Halleck submitted to MNN for airing on MNN's public access channels a video entitled "The 1% Visits the Barrio," based on

video footage taken at the El Barrio Firehouse opening (the "1% video"). The 1% video presented the Plaintiffs' view that MNN was "more interested in pleasing 'the 1%' than addressing the community programming needs of those living in East Harlem." FAC ¶ 83. MNN aired the 1% video on public access channels in October 2012.

In a letter dated October 11, 2012, defendant Jeanette Santiago, MNN's Programming Director, informed Halleck that she was suspended for three months from airing programs over MNN's public access channels. Santiago stated that the 1% video violated MNN's program content restrictions barring "participation in harassment or aggravated threat toward staff and/or other producers." FAC ¶ 86.[2] The Plaintiffs allege that Halleck was suspended because the 1% video "presented the view that MNN was more interested in pleasing 'the 1%' than addressing the community programming needs of those living in East Harlem." FAC ¶ 97.

---

[2] The letter quoted Melendez's statement in the 1% video that "People of color work in this building and I have to wait until people get fired, they retire or someone kills them so that I can come and have access to the facility here." FAC ¶ 87. Santiago said the letter "incited violence and harassment towards staff and was in direct violation of MNN's 'zero tolerance on harassment.'"

In a letter dated August 1, 2013, defendant Daniel Coughlin, MNN's executive director, suspended Melendez indefinitely from all MNN services and facilities. Coughlin claimed that at an encounter in July 2013 Melendez had "pushed him over." FAC ¶ 106. The Plaintiffs allege that Melendez was suspended because of the views he expressed in the 1% video. In a letter dated August 9, 2013, Coughlin suspended Halleck for one year from all MNN services and facilities, claiming receipt of complaints about the 1% video. Although Halleck's suspension has ended, she cannot air the 1% video on any public access channels in Manhattan. By letter dated April 24, 2015, defendant Cory Brice,[3] MNN's manager of production and facilitation, confirmed Melendez's indefinite suspension.

*District Court opinion.* With respect to the Plaintiffs' First Amendment claim against MNN, the District Court recognized that the claim, pursued under 42 U.S.C. § 1983, was viable only if MNN was a state actor because the First Amendment limits only governmental action. Acknowledging that MNN was a private entity, the Court first considered whether its actions might be subject to the First Amendment because "'[a]ctions of private entities can sometimes be

---

[3] The name was misspelled "Bryce" in the FAC.

8

regarded as governmental action for constitutional purposes.'" *Halleck*, 224 F. Supp. 3d at 243 (quoting *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 378 (1995)). The District Court noted that in *Lebron* the Supreme Court had stated that "'where . . . the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment.'" *Id.* (quoting *Lebron*, 513 U.S. at 399). The District Court deemed *Lebron* inapplicable because the Manhattan Borough President had authority to appoint only two of the thirteen members of MNN's board. *See id.*

The District Court then considered whether the First Amendment might apply to MNN's actions on the theory that a public access channel is a public forum. *See Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983) (recognizing traditional and designated public forums). Judge Pauley noted that Justices of the Supreme Court have taken different positions on the public forum issue, *see Halleck*, 224 F. Supp. 3d at 245 (citing opinions of Justices Kennedy and Thomas with respect to public access channels and Justice Breyer

with respect to leased channels), as have courts of appeals and district courts within the Second Circuit, *see id*. at 244-46.

Deeming the issue a "close call," *id*. at 246, Judge Pauley ruled that a public access channel is not a public forum for two reasons. First, he observed that "'[t]he ownership and operation of an entertainment facility are not powers traditionally exclusively reserved to the State, nor are they functions of sovereignty.'" *Id*. at 246 (citing *Glendora v. Cablevision Systems Corp.*, 893 F. Supp. 264, 269 (S.D.N.Y. 1995)). Second, he read our Court's decision in *Loce v. Time Warner Entertainment Advance/Newhouse Partnership*, 191 F.3d 256 (2d Cir. 1999), as "implicitly reject[ing] Plaintiffs' argument that public access channels are designated public fora because they are 'required by government fiat.'" *Halleck*, 224 F. Supp. 3d. at 247 (quoting Plaintiffs' opposition to motion to dismiss at 12). The District Court dismissed the First Amendment claim against MNN (and presumably its employees) for lack of state action.

With respect to the Plaintiffs' First Amendment claim against the City, the District Court noted that "'Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Id*. at 242 (quoting *Monell v. Dept. of Social Services of City of*

*New York*, 436 U.S. 658, 691 (1978)). In the absence of such a policy, the Court dismissed the claim against the City because the Plaintiffs had alleged only that the City was "'aware tha[t] MNN has censored plaintiffs' and other cable access programming.'" *Id*. at 243 (quoting FAC ¶ 126).

With the federal claims dismissed, the District Court declined to exercise pendent jurisdiction over the state law claims and granted the motion to dismiss the complaint.

Discussion

I. First Amendment Claim Against MNN and Its Employees

Because MNN is a private corporation, the viability of the Plaintiffs' First Amendment claim against it and its employees depends on whether MNN's actions can be deemed state action. A nominally private entity can be a state actor in several different circumstances. *See Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 296 (2001) (outlining seven examples of circumstances in which a private entity may be deemed a state actor).

Our consideration of whether the public access channels in the pending appeal are public forums must begin with the Supreme Court's decision in *Denver Area*, a case that generated six opinions spanning 112 pages of the United

States Reports. The case concerned the constitutionality of three provisions of the

Cable Television Consumer Protection and Competition Act of 1992 ("1992 Act"),

Pub. L. No. 102-385, §§ 10(a), 10(b), and 10(c), 106 Stat. 1460, 1486 (codified at 47

U.S.C. §§ 532(h), 532(j), and note following § 531). Sections 10(a) and 10(b) apply

to leased channels.[4] Section 10(c) applies to public access channels, with which

we are concerned on this appeal. It requires the Federal Communications

Commission to promulgate regulations that permit a cable operator to prohibit

"any programming which contains obscene material, sexually explicit conduct,

or material soliciting or promoting unlawful conduct." 1992 Act § 10(c).

The Supreme Court ruled section 10(a) constitutional, and sections 10(b)

and 10(c) unconstitutional. *See Denver Area*, 518 U.S. at 733, 768. With respect to

section 10(c), the only provision applicable to public access channels, the vote to

invalidate was five to four with the Justices issuing four opinions, summarized in

the margin.[5]

---

[4] Section 10(a) permits a cable operator to prohibit "patently offensive"
programming. 1992 Act § 10(a). Section 10(b) requires the Federal Communications
Commission to promulgate regulations that require cable operators to segregate
"indecent" programming, place it on a single channel, and block access unless a viewer
requests access. *Id.* § 10(b).

[5] Justice Breyer, writing for himself and Justices Stevens and Souter, voted to
invalidate section 10(c) because "the Government cannot sustain its burden of showing

Pertinent to the pending appeal, five Justices expressed differing views on whether public access channels were public forums. Justice Kennedy, with whom Justice Ginsburg concurred, said, "A public access channel is a public forum." *Id*. at 783. He pointed out, "'They provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas.'" *Id.* at 791-92 (quoting H.R. Rep. No. 98-934, at 30 (1984)). He further explained, "It is important to understand that public access channels are public fora created by local or state governments in the cable franchise," *id.* at 792, and added, "[W]hen a local government contracts to use private property for public expressive activity, it creates a public forum," *id.* at 794.

---

that § 10(c) is necessary to protect children or that it is appropriately tailored to secure that end." *Denver Area*, 518 U.S. at 766.

Justice Kennedy, writing for himself and Justice Ginsburg, acknowledged that Congress has "a compelling interest in protecting children from indecent speech," but voted to invalidate section 10(c) because it was not "narrowly tailored to serve a compelling interest." *Id*. at 805-06.

Justice O'Connor voted to uphold section 10(c) on the ground that it was a "permissive," sufficiently "tailored" provision that served "the well-established compelling interest of protecting children from exposure to indecent material. *Id.* at 779 -80.

Justice Thomas, writing for himself and Chief Justice Rehnquist and Justice Scalia, voted to uphold section 10(c) on the ground that the public access programmers could not challenge a scheme that restricted the free speech rights of cable operators. *Id.* at 823.

On the other hand, Justice Thomas, with whom Chief Justice Rehnquist and Justice Scalia concurred, said that a public access channel is not a public forum. His reason: a public access channel is privately owned. *See id.* at 826-31. That point precipitated an exchange between Justices Thomas and Kennedy as to whether the relationship between the governmental franchising authority and the operator of the cable system renders nominally private property, a public access channel, a designated public forum.

Justice Thomas acknowledged the Supreme Court's statement that "a public forum may consist of 'private property dedicated to public use.'" *Id.* at 827 (quoting *Cornelius v. NAACP Legal Defense & Education Fund, Inc.*, 473 U.S. 788, 801 (1985)). But, he pointed out, the quoted statement "refers to the common practice of formally dedicating land for streets and parks when subdividing real estate for developments." *Id.* "Such dedications," he continued, "at least create enforceable public easements in the dedicated land." *Id.* Thus, he concluded, "To the extent that those easements create a property interest in the underlying land, it is that government-owned property interest that may be designated as a public forum." *Id.* at 828.

In reply, Justice Kennedy explained, "[I]n return for granting cable operators easements to use public rights-of-way for their cable lines, local governments have bargained for a right to use cable lines for public access channels. . . . [N]o particular formalities are necessary to create an easement. . . . [W]hen a local government contracts to use private property for public expressive activity, it creates a public forum." *Id.* at 793-94.

In Part II of *Denver Area*, Justice Breyer, with whom Justices Stevens, O'Connor, and Souter concurred, explicitly declined to express a view as to whether a public access channel is a public forum. *See id*. at 742 ("We therefore think it premature to answer the broad questions that Justices Kennedy and Thomas raise in their efforts to find a definitive analogy, deciding, for example, the extent to which private property can be designated a public forum[.]").[6]

In view of the statutory, regulatory, and contractual framework under which this case arises and the purpose for which Congress authorized public access channels, we are persuaded by the conclusion reached by Justices Kennedy and Ginsburg. A public access channel is the electronic version of the

---

[6] As to leased channels, Justice Breyer said, "[I]t is unnecessary, indeed, unwise, for us definitively to decide whether or how to apply the public forum doctrine to [them]." 518 U.S. at 749.

public square. Without determining whether a public access channel is necessarily a public forum simply by virtue of its function in providing an equivalent of the public square, we conclude that where, as here, federal law authorizes setting aside channels for public access to be "the electronic marketplace of ideas," state regulation requires cable operators to provide at least one public access channel, a municipal contract requires a cable operator to provide four such channels, and a municipal official has designated a private corporation to run those channels, those channels are public forums.[7]

Because facilities or locations deemed to be public forums are usually operated by governments, determining that a particular facility or location is a public forum usually suffices to render the challenged action taken there to be state action subject to First Amendment limitations. *See, e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 265-68 (1981) (regulation issued by state university Board of Curators governing use of university buildings and grounds); *City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 169—76 (1976) (order issued by state employment commission governing employee speech at public school board meeting). In the pending case, however,

---

[7] We note that a State regulation permits the cable operator to prohibit obscenity or other content unprotected by the First Amendment. *See* N.Y. Com. Codes R. & Regs. tit. 16, § 895.4(c)(8).

the facilities deemed to be public forums are public access channels operated by a private non-profit corporation. In this situation, whether the First Amendment applies to the individuals who have taken the challenged actions in a public forum depends on whether they have a sufficient connection to governmental authority to be deemed state actors. That connection is established in this case by the fact that the Manhattan Borough President designated MNN to run the public access channels. The employees of MNN are not interlopers in a public forum; they are exercising precisely the authority to administer such a forum conferred on them by a senior municipal official. Whether they have taken the actions alleged and, if so, whether they have thereby violated First Amendment limitations are matters that remain to be determined in further proceedings.

The non-municipal defendants invoke our decision in *Loce v. Time Warner Entertainment Advance/Newhouse Partnership*, 191 F.3d 256 (2d Cir. 1999), to resist application of First Amendment restrictions to their alleged conduct. However, *Loce* neither ruled nor implied that a public access channel was not a public forum. *Loce* concerned leased channels, not public access channels. The different purposes for which Congress required leased channels and authorized franchising authorities to require public access channels underscore why the

latter are public forums. Congress required leased channels in order "to promote competition" with commercial channels "in the delivery of diverse sources of video programming." 47 U.S.C. § 532(a). The explicit purpose of public access channels was to give the public an enhanced opportunity to express its views. As the relevant committee said, public access channels are "the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet." H.R. Rep. No. 98-934, at 30 (1984). Leased channels concern economics. Public access channels concern democracy.

We note that the defendant in *Loce* was Time Warner, the operator of a cable system carrying the leased channel, not, as in this case, the entity operating the public access channels. And, we noted in *Loce,* "The record offer[ed] no evidence that Time Warner and the municipal franchising authorities jointly administer leased access channels." *Id.* at 267. Although Time Warner, the cable system operator, and the City do not jointly administer the public access channels in the pending case, MNN administers those channels under explicit authorization from a senior municipal official.

We acknowledge that other courts have not considered public access channels to be public forums. In *Alliance for Community Media v. FCC*, 56 F.3d 105

(D.C. Cir. 1995) (in banc), eight members of the eleven member in banc court found "no state action . . . because that essential element cannot be supplied by treating access channels as public forums." *Id*. at 123. As pointed out above, when that decision was reviewed and reversed in part by the Supreme Court in *Denver Area*, two Justices (Kennedy and Ginsburg) explicitly disagreed with the D.C. Circuit's view about public access channels and four Justices (Stevens, O'Connor, Souter, and Breyer) found it unnecessary to consider that view.[8]

Several District Courts have considered whether a public access channel is a public forum and have reached conflicting results. *Compare Egli v. Strimel*, No. 14-cv-6204, 2015 WL 5093048, at *4 (E.D. Pa. Aug. 28, 2015) (public forum); *Brennan v. Williams Paterson College*, 34 F. Supp. 3d 416, 428 (D.N.J. 2014) (public forum plausibly alleged); *Rhames v. City of Biddeford*, 204 F. Supp. 2d 45, 50 (D. Me. 2002) (recognizing applicability of public forum analysis); *Jersawitz v. People TV*, 71 F. Supp. 2d 1330, 1341 (N.D. Ga. 1999) (public forum), *with Morrone v. CSC Holdings Corp.*, 363 F. Supp. 2d 552, 558 (E.D.N.Y. 2005) (not public forum); *Glendora v. Tele-Communications, Inc.*, No. 96-cv-4270 (BSJ), 1996 WL 721077, at *3

---

[8] In *Wilcher v. City of Akron*, 498 F.3d 516 (6th Cir. 2007), the Sixth Circuit, without deciding whether a public access channel might be deemed a public forum, ruled that the operator of a cable system carrying a public access channel was not a state actor.

(S.D.N.Y. Dec. 13, 1996) (same); *Glendora v. Cablevision Systems Corp.*, 893 F. Supp. 264, 270 (S.D.N.Y. 1995) (same); *see also Glendora v. Hostetter*, 916 F. Supp. 1339, 1341 (S.D.N.Y. 1996) (noting that two of the decisions cited above had ruled that public access channels are not public forums).

With all respect to those courts that have expressed a view different from ours, we agree with the view expressed by Justices Kennedy and Ginsburg in *Denver Area*. Public access channels, authorized by Congress to be "the video equivalent of the speaker's soapbox" and operating under the municipal authority given to MNN in this case, are public forums, and, in the circumstances of this case, MNN and its employees are subject to First Amendment restrictions.

II. Municipal Liability

We agree with the District Court that the complaint does not allege actions by the City that suffice to make it liable for the Plaintiffs' federal claims. Municipal liability under section 1983 arises when the challenged action was taken pursuant to a municipal policy. *See Monell*, 436 U.S. at 691-95. No such policy has been alleged in this case, much less the required "direct causal link between a municipal policy or custom and the alleged constitutional deprivation," *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Conclusion

The judgment of the District Court is reversed as to MNN and its employees, affirmed as to the City, and remanded for further proceedings.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

21